UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


WILLIAM J. O'DELL,

          Plaintiff,

v.                          CIVIL ACTION NO. 2:05-CV-00040

COAL COMPANY EMPLOYEES'
COMPREHENSIVE BENEFITS PLAN
and BENEFITS COMMITTEE,

          Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>

      Pending are motions for summary judgment by plaintiff
William J. O'Dell and defendants Coal Company Employees'
Comprehensive Benefits Plan ("Plan") and Benefits Committee
("Committee"), each filed January 31, 2006.


I.


      O'Dell is a fifty year-old former employee of White
Buck Coal Company ("White Buck"), a subsidiary of Massey Energy
Company ("Massey").  (Aff. of William J. O'Dell ¶ 2).  He worked
for White Buck and Massey from March 1997 to July 11, 2002.  (<u>Id.</u>

¶ 2).  O'Dell was a participant in the Plan, an entity which qualifies as an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 <u>et</u> <u>seq.</u>  In the factual discussion that follows, the court will examine (1) O'Dell's medical history as it appears in the administrative record, (2) the relevant Plan provisions and the Committee's structure and operation, and (3) the procedural history of O'Dell's claim and this action.

A.   O'Dell's Medical History Within the Administrative Record

On July 28, 1999, O'Dell sustained a back injury while unloading, by himself, a 250 to 300 pound plaster machine from a scoop bucket.  (<u>Id.</u> ¶ 3).  He was treated with pain medication by Dr. Louis Groves, after which he continued to work until July 11, 2002, when he left Massey as a result of the back injury.  (<u>Id.</u>)

Including his visit to Dr. Groves, O'Dell has been seen, or had certain of his medical records reviewed, by ten physicians, namely, Timothy Conner, M.D., Robert J. Crow, M.D., of Neurological Associates Group, Saghir Mir, M.D., Alex Ambroz, M.D., James D. Weinstein, M.D., a board certified orthopedic surgeon, Jack Riggs, M.D., professor at the West Virginia

University Department of Neurology, Rodolfo Gobunsuy, M.D.,
Joseph A. Snead, M.D., a board certified orthopedic surgeon, and
Prasadarao Mukkamala, M.D., a diplomate of the American Board of
Physical Medicine and Rehabilitation, the American Board of
Electrodiagnostic Medicine, and the American Academy of Pain
Management.  (Admin. Rec. at 2, 10, 72, 37) (hereinafter "AR at
_____").  Dr. Mukkamala is also a Fellow of the American Academy
of Disability Evaluating Physicians.  (Id. at 37).

On July 18, 2002, at Dr. Groves request, and just days
after O'Dell ceased work, Dr. Conner performed a magnetic
resonance imaging ("MRI") study of O'Dell's lumbar spine.  (Id.)
The study notes O'Dell had been suffering severe low back pain
radiating to his hip and leg.  (Id.)  The study additionally
revealed a "small left lateral L2-3 disc rupture with impression
of the lateral recess" and "significant L3-4 disc bulge and
osteophytosis without focal disc rupture."  Dr. Conner opined as
follows: "I do not see a true focal disc rupture . . . . Bony
alignment is normal."  (Id.)

On August 1, 2002, O'Dell applied for disability
benefits from the Social Security Administration ("SSA").  (Id.
at 71).  The development and outcome of his claim is discussed in
greater detail within.

3

On January 8, 2003, O'Dell was seen by Dr. James Weinstein.  Dr. Weinstein noted pertinently as follows:

> I reviewed the patient's lumbar MRI.  He has degenerative disc disease at 3/4 and what looks like there may be arthritis at that area with a secondary stenosis of modest degree.  He has a small left lateral 2/3 disc rupture, but I don't think this is significant because he doesn't really have pain on the left side.  However, I am concerned about the 3/4 pathology and I would like to see a diagnostic myelogram/CT scan to review to see if in fact there is 3/4 pathology that might benefit with some sort of surgery.  Obviously, he has a bad back and obviously he has significant degenerative disc at that 3/4 level, which may itself produce symptoms.  But, I am interested to see whether or not he has nerve root compression there as well.

(Id. at 8).

On January 30, 2003, O'Dell was evaluated by Dr. Saghir Mir.  (Id. at 10).  Dr. Mir noted two prior back injuries in addition to the 1999 mishap.  On December 3, 1985, O'Dell injured his back while sweeping a bath house.  (Id. and AR at 13).  On March 26, 1990, he injured it again while lifting a timber.[1] (Id.).  O'Dell self reported that he had continued to see Dr. Groves throughout 2000-2002 due to "constant pain in the lower

---

[1]Dr. Mir noted O'Dell had been seen on January 14, 2000, by Dr. Alex Ambroz, who "calculated 0% whole man impairment from all of his three claims."  (Id. at 10).  The "claims" referred to appear to be of the worker's compensation variety.  This same finding was apparently repeated by Dr. Ambroz in 2002, which O'Dell protested.  (Id. at 11).

4

back, which was progressively getting worse . . . [and for which

he] . . . was treated with medication." (Id. at 11). Dr. Mir

noted that, apparently in 2002, O'Dell "had some worsening of

symptoms with his physical therapy." (Id.) O'Dell reported a

worsening of his symptoms with "a constant aching and burning

type of pain." (Id. at 12). It was self-reported that prolonged

"sitting, standing, walking and riding in a car increases his

back symptoms." (Id.) He also noted two or three visits to the

emergency room for pain injections. (Id.). At the time, O'Dell

was taking both Darvocet and Hydrocodone. (Id. at 13). Dr. Mir

reported the following conclusions and recommendations:

> 3) Patient has not reached maximum degree of medical
> improvement. At the time of examination he continues
> to be temporarily disabled. An anticipated period of
> disability could be another four months.
>
> 4) As far as this patient's treatment is concerned the
> following recommendations are made: . . . This patient
> should go ahead and have Myelogram with CT Scan. . . .
> Probably he will require discectomy and fusion at L3-L4
> level. . . In case no surgery is indicated then he
> could be referred to pain clinic for trial of epidural
> and facet joint injections.
>
> 5) At present patient is not ready for FCE. Vocational
> follow up is recommended. Also at present his return
> to work prognosis seems poor considering he has already
> applied for Disability Social Security benefits.

(Id. at 15).

On February 15, 2003, O'Dell was seen by Dr. Joseph

Snead for an impairment evaluation. (Id. at 21). Dr. Snead

noted the patient's history was "significant in that he has worked in the coal mine for twenty-eight years and has had a couple of back injuries" previously.  (<u>Id.</u> at 21).  During the physical examination, Dr. Snead noted leg-raise testing resulted "in a significantly positive test for nerve route [sic] irritation."  (<u>Id.</u> at 22).  Dr. Snead's recommendation and conclusion was as follows:

> I concur that he needs to see Dr. Weinstein for CT myelogram and he might need surgery but this is definitely not going to put him back to work in a coal mine and if he gets any improvement it is only going to be to make his sedentary lifestyle more comfortable.
>
> In fact, I believe this man is totally disabled for any kind of work or gainful employment he would be qualified for by reason of age, experience and work history.  He is not able to bend, stoop, lift, or stand for any prolonged period of time.  In fact, based on <u>what I saw today</u> I do not think he could even do sedentary work because he is so uncomfortable and in so much pain.

(<u>Id.</u> at 23) (emphasis supplied).

On February 27, 2003, Dr. Weinstein followed up after O'Dell received the recommended myelogram/CT scan on February 20, 2003.  He observed as follows:

> The only positive is a little disc bulge at 4/5, but it is on the left side while the patient's symptoms are primarily on the right.  I think the degenerative process at 3/4 is producing nerve root irritation.  But I don't recommend any surgery because he will just get scar tissue and, in the long run, will be worse.

6

> I think the patient should continue with exercises and
> physical therapy.  Hopefully, he will be able to return
> to work, perhaps wearing a brace.

(Id. at 9).[2]

On March 3, 2003, O'Dell was examined by Dr. Robert
Crow.  (Id. at 5).  O'Dell self-reported that when he ceased
taking Darvocet, he had a significant increase in back and leg
symptoms, including pain and paresthesia in both legs.  (Id.)
O'Dell rated his pain at a 9 on a scale of 10, aggravated by any
activity.  (Id.)  After reviewing the MRI study, Dr. Crow
additionally observed as follows:

> multi-level degenerative disc and spondylotic change
> with disc bulging at multiple levels and decreased disc
> space height especially at L3-4.  At L2-3 there appears
> to be a far lateral/extra foraminal disc herniation of
> the left.  At L3-4 there is a central and bilaterally
> directed disc protrusion which causes mild to moderate
> canal stenosis.

(Id.)  Dr. Crow's impressions were as follows:

> Chronic low back pain with multi-level spondylotic
> change. . . . I see no surgical lesion on the MRI and
> in addition to the fact that his neurologic examination
> is normal, in view of that I would not recommend
> surgical intervention.  I would recommend to the
> referring physician in light of the fact that the
> patient has had a chronic spine problem that he be

---

[2]The reader, Sherif Wassef, noted, inter alia, the disc
bulge at L3-4 was "probably touching the exiting nerve root on
the right side" and that the bulge at L4-5 was "probably touching
the exiting nerve root and the left nerve root . . . ."  (Id. at
19).

7

> worked up for any treatable arthritis with simple
> laboratories . . . . I would also recommend to the
> referring physician that the patient be treated
> conservatively with physical therapy and/or pain clinic
> evaluation and management as needed.  I see no reason
> for follow-up.

(Id. at 6).

On April 28, 2003, O'Dell was seen by Dr. Jack Riggs, a professor at the West Virginia University Department of Neurology.  (Id. at 26-27).  Dr. Riggs recommended a current MRI and EMG to determine the presence of lumbosacral radiculopathy. He noted additionally that O'Dell "may well have a right lateral femoral cutaneous neuropathy accounting for the numbness in the right lateral thigh."  (Id. at 26).

On June 16, 2003, Dr. Riggs followed up after O'Dell had further, attempted diagnostic testing.  Specifically, Dr. Riggs observed that O'Dell participated in the EMG studies, "which he was not able to tolerate."  (Id. at 28).  Dr. Riggs additionally noted as follows:

> He had the lumbar MRI which showed multilevel
> degenerative changes that were most prominent at the
> L3-L4 levels and the L5-S1 levels.  I do not think that
> there was any significant surgical disease but I would
> suggest going ahead and having him evaluated by
> neurosurgery again just to make sure that they again
> feel that no surgical intervention is indicated.  I do
> think it would be appropriate at this time to go ahead
> and have him evaluated by [a] pain clinic.

(Id.)

8

On July 11, 2003, O'Dell was evaluated by vocational consultant Lisa Goudy at the behest of the SSA.  Ms. Goudy "could not identify employment appropriate for" O'Dell.  (<u>Id.</u> at 72).

On August 7, 2003, O'Dell was evaluated by Nancy Harris, a counselor at the West Virginia Division of Rehabilitation Services.  (<u>Id.</u> at 30).  Ms. Harris reported her observations to Evetta Kessel, a claims manager at the West Virginia Workers' Compensation Division:

> It is my impression that William is in so much pain and so incapacitated that he could not work productively in any capacity on a regular and consistent basis. . . . During the time we met to discuss his situation, he was unable to stand for more than a few minutes or sit for more than a few minutes.  He did not complain or exhibit exaggerated pain behaviors; but he had to change positions constantly and was most comfortable kneeling on the floor leaning against a table, with his back straight.  A co-worker who knows William confirmed that he has always been a hard worker.  She also said that he is completely unable to participate in recreational activities with his family and although he attends church, he can not sit through the whole service and is constantly getting up and walking around.  Her observations were consistent with mine. . . . At this time, he does not appear to be a viable candidate for vocational rehabilitation services. . . . I appreciate the referral.  I am sorry that I can not be of help in this case.

(<u>Id.</u> at 30).

On September 11, 2003, Dr. Rodolfo Gobunsuy examined O'Dell for the West Virginia Disability Determination Section

("DDS").[3]  (Id. at 72).  Straight-leg testing on O'Dell was
positive and his right leg was numb.  (Id.)  Right leg muscle
strength was decreased and his lumbar range of motion was
restricted.  (Id.)  Dr. Gobunsuy rated O'Dell's residual function
capacity as sedentary.  (Id.)

        On October 7, 2003, Massey notified O'Dell that he
would be required to undergo an independent medical examination
by Dr. Prasadaro Mukkamala.  (Id. at 34).  Just days later, on
October 20, 2003, O'Dell was awarded disability benefits by the
SSA.  The assigned administrative law judge made the following
pertinent findings:

    1.  The claimant has not engaged in any substantial
        gainful activity since the disability onset date
        [of July 1, 2002].

    2.  The claimant's impairments which are considered to
        be "severe" under the . . . [SSA] are as follows:
        degenerative disc disease, spinal stenosis and
        retrolisthesis.

    . . . .

    5.  The claimant has the residual functional capacity to do
        the following: perform the exertional demands of
        sedentary work, or work which is generally performed
        while sitting and does not require lifting in excess of
        ten pounds.  The claimant is unable to sustain work
        activities in an ordinary work setting on a regular and
        continuing basis.

_____

        [3]The DDS is a state agency that acts by agreement with the
SSA.  The precise contours of the relationship, however, are not
material to resolution of the issues in the case.

6.  The claimant is unable to perform his past relevant work.

7.  The claimant was 46 years old . . . on the date his disability began.  The claimant has a high school education.

8.  The claimant does not have skills which are transferable to work within his residual functional capacity.

9.  Based upon the claimant's residual functional capacity, and vocational factors, there are no jobs existing in significant numbers which he can perform. . . .

(Id. at 74).

On November 6 and 11, 2003, Massey retained Mountaineer Investigation and Security, Inc., to conduct surveillance on O'Dell's residence.  (Id. at 31).  On November 11, 2003, the investigator, James Brogan, appears to have watched the residence for over 10 hours during the early morning and afternoon. (Id.) Beyond noting that a boat at the home had been moved since the November 6, 2003, surveillance, and that O'Dell was "well equipped with leisure equipment[,]" there were no other significant observations.  (Id.)

On December 2, 2003, O'Dell was evaluated by Dr. Mukkamala.  (Id. at 37).  O'Dell reported to Dr. Mukkamala that he had been visiting the pain clinic in Morgantown since August 2003 and that the two epidural injections he had thus far received helped his lower extremity pain.  (Id. at 39).  O'Dell

11

additionally self reported as follows:

> [he] spends most of the day from lying down . . . to
> the recliner . . . . He mentioned that after he started
> having the epidural injections, he started moving
> around somewhat better.  Currently he states he is able
> to walk about 100 yards at which time the leg gets
> numb.  He has to sit for about 5 to 8 minutes to get
> the feeling back.

(Id. at 39).  Dr. Mukkamala concluded that O'Dell had reached his

maximum degree of medical improvement following the July 1999

injury.  (Id. at 42).  He additionally provided the following

findings and conclusions:

> [O'Dell] received some physical therapy in the past
> which at that time he could not tolerate.  However, at
> this time, he might benefit from additional physical
> therapy.  He received epidural injections from which he
> obtained some relief. . . . However, once again, he
> might benefit from physical therapy for about 3 to 4
> weeks to work on improving his flexibility and strength
> to improve his posture, both static posture as well as
> dynamic posture.
>
>     Mr. O'Dell at this time should be able to perform
> sedentary activities.  His reported level of activity
> is such that he moves from lying down at home to the
> recliner.  However, to really improve the level of
> performance, he should improve his activity as
> tolerated.  There is absolutely no contra-indication
> for him to improve his level of activity.  So at this
> time, even though he is limiting himself to sedentary
> or less than sedentary activity level he needs to move
> up to light category level.
>
>     I conclude that Mr. O'Dell is not totally
> disabled.  He does continue to have significant
> limitations at this time but he should be able to work
> at a sedentary/light category work level provided that
> he is allowed to avoid frequent bending and twisting of
> his back and also provided that he has the freedom to
> move around frequently.  So if he has the freedom to

12

> sit and stand as needed, he should be able to work at a sedentary/light category work level at this time. Furthermore, he may not be able to work in low coal such as 36".

(<u>Id.</u> at 43).

B.   The Relevant Plan Provisions and the Committee's Structure and Operation

The Committee's relationship to Massey informs the court's determination of the appropriate standard of review. Relevant Plan provisions are first discussed, followed by considerations relevant to the degree of independence actually experienced by the Committee.

The Plan provides the following definition of the phrase "Totally Disabled[:]"

> Totally Disabled refers to a condition that can be expected to result in death or to be of long, continued, and indefinite duration, which condition renders an individual unable to work at any substantial employment for which he is reasonably suited by education or experience, and which condition exists by reason of any medically determinable physical or mental impairment.  The Administrator will make the final determination as to the existence of a Total Disability.  This determination may differ from the determination made for . . . [SSA] benefits or by any other government agency.

(AR 203).  The final two sentences of the foregoing definition suggest a measure of discretion is reposed in the Administrator

13

to make the total-disability determination.  At least four other
Plan provisions are relevant on that score as well.

First, section 12.03, found in the Plan article dealing
with administration, provides as follows:

> (a) <u>Plan decisions.</u>  The Administrator must
> administer the Plan by its terms and has all powers
> necessary to do so.  The Administrator's primary duty
> is to interpret the Plan.  The duties of the
> Administrator include, but are not limited to:
>
> > (1) determining the answers to all
> > questions relating to the Employees'
> > eligibility to become Participants and any
> > claimant's eligibility to receive Plan
> > Benefits . . . .

(<u>Id.</u> at 182).

Second, section 14.33 defines an "Eligible Employee" as
one "who satisfies the age, service, and application requirements
for participation in . . . Disability Benefits . . . according to
the appropriate schedule."  (<u>Id.</u> at 197).  The significance of
this definition for standard of review purposes becomes apparent
when one examines section 2.01(e):

> (e) <u>Determination of eligibility.</u>  Using its
> discretion, <u>the Administrator must determine whether or
> not an Employee is an Eligible Employee</u>, whether an
> individual is an Eligible Dependent or whether an
> individual is a Beneficiary under a Plan Benefit[,
> which includes Disability Benefits].

(<u>Id.</u> at 120, 200) (emphasis supplied).

14

Third, the Plan additionally grants the Administrator full authority to "exercise its discretion in implementing any provision in" article X of the Plan, which includes section 10.02(b) governing "Proof Required for Disability Benefits[.]" (Id. at 167).

Fourth, and perhaps of most significance, O'Dell concedes that the Committee has been appointed pursuant to section 12.09(a) of the Plan and that such entity now acts as the Administrator. (See Am. Compl. ¶ 3; AR at 285). These facts are of significance inasmuch as the Committee is explicitly empowered "to construe the Plan and to determine all questions that arise thereunder." (Id. at 186).

Regarding the Committee's day-to-day independence from Massey, the Plan sponsor, the court notes the interrogatory responses provided to O'Dell by John Poma, a member of the Committee and Massey's Vice-President of Human Resources. (Defs.' Mot. for Summ. J., ex. A at 1). First, the responses reveal that "[n]either the . . . Committee nor any of its members is accountable to any member of senior management at Massey . . . for decisions reached by the . . . Committee." (Id. at 1-2).

Second, there are no formal means by which any senior member of Massey would learn when or where Committee meetings are

15

held or when and whether any participant's eligibility is discussed.  (Id. at 2).  Third, Committee decisions are not reported to senior management and decision letters are treated as confidential and kept in secure files.  (Id.)  Fourth, the decisions reached by the Committee have no effect on the Committee members' compensation or tenure.  (Id.)  Fifth, the Committee is not apprised of the estimated or actual costs associated with awarded claims.  (Id.)  Sixth, "on a consolidated financial basis, the liability associated with long-term disability claims is not material from a financial accounting perspective."  (Id.)

The Committee also includes an independent medical professional as one of its five voting members, Dr. Sterling Ransone.  (Id.)  Dr. Ransone is not an employee of Massey or any of its affiliates.  (Id.)  The vote concerning O'Dell's claim was unanimous, meaning Dr. Ransone found the claim non-compensable. (Id.)

Finally, the minutes of the relevant Committee meeting where O'Dell's appeal was considered include the following admonition by Mr. Poma:

> John Poma addressed the role of the . . .
> Committee members.  He reminded the members that the .
> . . Committee is an independent committee convened
> solely to decide benefits and no other reason.  The

16

> decisions of this [C]ommittee are reported to no one
> other than the participant, his attorney, and to
> outside consultants as may be required for making
> payments or financial reporting. Senior management is
> not apprised of the results of this meeting or how
> individual members may have voted. The member's
> responsibility is to make the correct decision without
> regard to anything other than the plan terms and the
> entirety of the evidence before them. . . . As a . . .
> Committee member, . . . [you are] . . . required to act
> only with the interests of the participants and the
> Plan provisions in mind. The Committee member[s]
> should do so without regard to how it may impact . . .
> Massey or . . . [your] employer.

(Id. at 76).

C.   The Procedural History of the Claim and this Action.

        O'Dell received extended medical benefits for 12 months
after he ceased working under the Plan's Short Term Disability
Benefits Schedule. (O'Dell Aff. ¶ 16). On May 22, 2003, Massey
informed O'Dell that those short-term benefits would expire
unless he was determined to be totally disabled under the Plan.
(Id. ¶ 16). On May 28, 2003, O'Dell sought such a determination
by filing the Extended Coverage Application ("application")
Massey had sent to him on May 22, 2003. (AR at 1). O'Dell's
benefits claim was based on alleged back pain and a ruptured and
bulging disc. (Id.)

17

On January 9, 2004, the Committee denied O'Dell's application. (<u>Id.</u> at 45). The denial letter was signed by Mr. Poma. (<u>Id.</u> at 50). The letter advised, <u>inter alia</u>, as follows:

> [W]e find that you do not meet the Plan's definition of "Totally Disabled" as we find that the medical documentation does not indicate you are unable to work at any substantial employment for which you are reasonably suited by education and experience. Therefore, we find that you do not qualify for extended medical coverage.

>     . . . .

> The medical documentation does <i>not</i> indicate that you are unable to engage in any employment. Your neurological examination is normal and surgery is not recommended. It is noted that Dr. Snead indicates that he believes you are totally disabled from any kind of work. However, we find the collective opinions of the other physicians more compelling. Dr. Mir indicates you are temporarily disabled with an anticipated period of disability for another four months. He does not specify that your disability will be of long, continued, and indefinite duration and which renders you unable to work at any substantial employment. Dr. Mukkamala conducted a comprehensive physical examination and concludes that you are not totally disabled. He indicates that you have significant limitations but should be able to work at a sedentary/light category work level with certain restrictions. We find his report reliable as it is thorough and well reasoned. It as also noted that you have a high school education. Therefore, we find that you do not have a condition that can be expected to result in death or to be of long, continued and indefinite duration and which renders you unable to work at any substantial employment.

(<u>Id.</u> at 47, 49 (emphasis in original).

On February 24, 2004, O'Dell appealed the Committee's decision, attaching the SSA's disability determination.  (<u>Id.</u> at 67).  On April 2, 2004, the Committee acknowledged the appeal and invited O'Dell to "submit any additional medical documentation you wish to be considered . . . ."  (<u>Id.</u> at 68).

The minutes reflect the following, additional discussion:

> The Committee recognized and discussed the differing medical opinions.  The Committee noted that Dr. Snead indicates Mr. O'Dell is totally disabled from any gainful employment.  It is also noted that Nancy Harris, rehabilitation counselor, indicated Mr. O'Dell did not appear to be a viable candidate for vocational rehabilitation services.  Dr. Mir indicated that Mr. O'Dell is temporarily disabled; however, he did not specify that his disability will be of long, continued, and indefinite duration.  It is noted that the Administrative Law Judge (ALJ) determined Mr. O'Dell is disabled; however, the ALJ's decision is based on social security regulations which are different from our plan provisions.  The ALJ also indicates Mr. O'Dell has the residual functional capacity to perform the exertional demands of sedentary work.  Dr. Mukkamala, a board certified physician in physical medicine and rehabilitation, examined Mr. O'Dell.  Dr. Mukkamala concluded that he is not totally disabled and can perform a job at a sedentary/light category work level.  In fact, Dr. Mukkamala stated that "there is absolutely no contra-indication for him to improve his level of activity," and he found no medical reason for Mr. O'Dell to limit himself to a sedentary activity level.  In addition, Dr. Crow noted Mr. O'Dell's neurological examination is normal.  Ultimately, the Committee gave greater weight to and relied upon the results of Dr. Mukkamala's examination.  He performed an extensive and thorough examination providing a report that was very comprehensive and well reasoned.  It is also noted that

19

> O'Dell has a high school education.
>
> After a through discussion, and with each member's consent, ballots were distributed to each Committee member to vote and to determine if Mr. O'Dell met the Plan's definition of "Totally Disabled" . . . in order to qualify him for extended medical coverage under the Plan.  By a vote of 4-0, the . . . Committee found that he was not eligible and therefore his appeal was denied.

(Id. at 80-81).  On June 11, 2004, the Committee issued a substantial written decision that further explicated the conclusion reflected in the minutes.  (Id. at 82-88).

On October 12, 2004, O'Dell instituted this action in the Circuit Court of Nicholas County.  (Not. of Remov., ex. C).  On January 13, 2005, defendants removed.  On April 28, 2005, O'Dell filed an amended complaint.  (Am. Compl. at 1).  The modified pleading alleges claims for (1) breach of contract resulting from the denial of Plan benefits in the form of extended medical coverage, (2) denial of a reasonable expectation of coverage by the Plan, (3) common-law bad faith and breach of fiduciary duty, (4) violation of the West Virginia Unfair Claims Settlement Practices Act, and (5) punitive damages.  (Compl. ¶¶ 10-24).

On July 18, 2005, the court ordered O'Dell to show cause why Counts II through V of his complaint should not be

dismissed.  On August 10, 2005, the court dismissed these counts
after O'Dell acknowledged in writing that the claims stated
therein were preempted by ERISA.  The amended complaint, as
construed by the court in accordance with governing precedent,
now states but one claim, namely, for the wrongful denial of
benefits in violation of 29 U.S.C. § 1132(a)(1)(B).

On May 25, 2005, O'Dell moved for a discovery period,
seeking a substantial amount of information not contained within
the administrative record.  On July 18, 2005, the court observed
as follows:

> Plaintiff unequivocally states that he wishes to
> conduct discovery to ensure that the correct standard
> of review is applied to the . . . Committee's denial of
> his application for benefits, and he appears to seek
> discovery for no other purpose.  But, it seems, the
> question is not whether the abuse of discretion
> standard applies; rather it is whether the court is to
> modify the standard based on conflict of interest.
> Because it appears from the administrative record that
> the Plan is self-administered, and because defendants
> have offered no reason why the standard should not be
> modified, the likelihood of conflict requiring
> modification appears substantial.  It seems that the
> interests of justice would best be served by allowing
> plaintiff a short period of discovery for the limited
> purpose of confirming the nature of the . . .
> Committee's relationship to the Plan's contributor,
> unless the issue can be resolved by agreement.

O'Dell v. Coal Co. Employees' Comprehensive Benefits Plan, No.
2:05-0040 (S.D. W. Va. Jul. 18, 2005).  The court denied O'Dell's
motion without prejudice and invited the parties to reach a

21

stipulation concerning the Committee's relationship to Massey. Id. at 8.

On August 9, 2005, the parties filed a joint status report.  The report stated pertinently as follows:

> The Parties agree that the Court should apply the "modified abuse of discretion" standard of review. However, the Parties agree that limited discovery is necessary to determine the extent of a conflict of interest.  That discovery will allow that [sic] Parties to advise the Court as to the *degree* of modification to the "abuse of discretion" standard of review that is appropriate.  The Parties have agreed to engage in written discovery to determine the extent of a conflict of interest.

(Jt. Stat. Rep. at 1 (emphasis in original).  On August 10, 2005, the court entered a scheduling order.  The pending dispositive motions were filed in compliance with the scheduling order, as modified on December 14, 2005.

II.

A.   Standard of Review

The standard of review for a decision made by an administrator of an ERISA benefit plan generally is de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Bynum v. Cigna Healthcare of North Carolina, Inc., 287 F.3d 305,

22

311 (4th Cir. 2002); <u>Richards v. UMWA Health & Retirement Fund</u>, 895 F.2d 133, 135 (4th Cir. 1989); <u>de Nobel v. Vitro Corp.</u>, 885 F.2d 1180, 1186 (4th Cir. 1989).  Where the plan gives the administrator discretion to determine benefit eligibility or to construe plan terms, however, the standard of review is whether the administrator abused its discretion.  <u>Firestone</u>, 489 U.S. at 111; <u>Stup v. Unum Life Ins. Co. of Am.</u>, 390 F.3d 301, 307 (4th Cir. 2004); <u>Bynum</u>, 287 F.3d at 311.

Under this standard, a plan administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. See <u>Smith v. Continental Cas. Co.</u>, 369 F.3d 412, 417 (4th Cir. 2004); <u>Feder v. Paul Revere Life Ins. Co.</u>, 228 F.3d 518, 522 (4th Cir. 2000). "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." <u>Ellis v. Metropolitan Life Ins. Co.</u>, 126 F.3d 228, 232 (4th Cir. 1997) (internal quotation marks omitted).

Where a plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, however, a reviewing court must also weigh that conflict "in determining whether there [has been] an abuse of discretion." <u>Firestone</u>, 489

23

U.S. at 115; <u>see</u> <u>Booth v. Wal-Mart Stores, Inc. Assocs. Health &</u>
<u>Welfare Plan</u>, 201 F.3d 335, 342 (4th Cir. 2000).  A court then
reduces the amount of deference accorded the administrator's
decision and determines, based on review of the record before the
administrator at the time of its decision, whether the outcome is
consistent with one that might have been made by an administrator
acting free of the interests that conflict with those of the
participants and beneficiaries.  <u>See</u> <u>Ellis</u>, 126 F.3d at 233
("[I]n no case does the court deviate from the abuse of
discretion standard. Instead, the court modifies that abuse of
discretion standard according to a sliding scale.  The more
incentive for the administrator . . . to benefit itself by a
certain interpretation of benefit eligibility or other plan
terms, the more objectively reasonable the administrator['s] . .
. decision must be and the more substantial the evidence must be
to support it.").

        In sum, "the greater the 'incentive for the [plan]
administrator . . . to benefit itself by a certain interpretation
of benefit eligibility . . . , the more objectively reasonable
the administrator['s] . . . decision must be and the more
substantial the evidence must be to support it." <u>Bynum</u>, 287 F.3d
at 311 (quoting <u>Ellis v. Metro. Life Ins. Co.</u>, 126 F.3d 228, 234

(4th Cir. 1997)).  The court is called upon in such a situation

to "lessen the deference normally given under this standard of

review . . . to the extent necessary to counteract any influence

unduly resulting from the conflict."  <u>Bynum</u>, 287 F.3d at 312

(quoting <u>Ellis</u>, 126 F.3d at 233).

     Beyond these considerations for setting the applicable

standard of review, the court of appeals in <u>Booth</u> provided

guidance on how to conduct an inquiry concerning the

reasonableness of an administrator's decision.  The court of

appeals assembled a multi-factor test, which it noted includes:

> (1) the language of the plan; (2) the purposes and
> goals of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to which
> they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was reasoned and
> principled; (6) whether the decision was consistent
> with the procedural and substantive requirements of
> ERISA; (7) any external standard relevant to the
> exercise of discretion; and (8) the fiduciary's motives
> and any conflict of interest it may have.

<u>Booth</u>, 201 F.3d at 342-43; <u>Johannssen v. District No. 1-Pacific

Coast Dist., MEBA Pension Plan</u>, 292 F.3d 159, 176 (4th Cir.

2002); <u>see also Lockhart v. UMWA 1974 Pension Trust</u>, 5 F.3d 74,

77 (4th Cir. 1993).

25

There are compelling reasons for the deferential standard of review, not the least of which is that it "'ensure[s] that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional.'"  Brogan v. Holland, 105 F.3d 158, 164 (4th Cir. 1997); Johannssen, 292 F.3d at 169.  As noted by the court of appeals in Brogan, no abuse is present if the decision "'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'"  Brogan, 105 F.3d at 161 (quoted authority omitted).  Lockhart similarly noted the "dispositive principle remains . . . that where plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace it with an interpretation of their own."  Id. at 77.

The court is cognizant also of the principle that plan fiduciaries are "obligated 'to guard the assets of the trust from improper claims, as well as . . . to pay legitimate claims.'"  See Brogan, 105 F.3d at 164 (quoting LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 207 (4th Cir. 1984)).

B.   The Standard Applicable to the Committee

In determining the appropriate standard of review for the instant benefits denial, the court is confronted with two

26

questions.  First, the Plan provisions already noted must be examined to determine whether the Committee's decision is subject to <u>de novo</u> review or, instead, the deferential abuse-of-discretion standard.  Second, assuming applicability of the more deferential standard, the court must take account of the relationship between the Committee and Massey and determine how much it must temper, if any, the abuse-of-discretion standard to account for any conflict of interest.

Regarding the first inquiry, a number of discretion-granting provisions have been noted.  Sections 12.03(a) alone, however, is dispositive:

> (a) <u>Plan decisions.</u>  The Administrator must administer the Plan by its terms and has all powers necessary to do so.  <u>The Administrator's primary duty is to interpret the Plan</u>.  The duties of the Administrator include, <u>but are not limited to</u>:
>
> > (1) <u>determining the answers to all questions relating to</u> the Employees' eligibility to become Participants and <u>any claimant's eligibility to receive Plan Benefits</u> . . . .

(<u>Id.</u> at 182) (emphasis supplied).  The underscored language explicitly accords the Committee, as administrator, both the discretion to determine benefit eligibility and to construe the Plan.  The court, accordingly, concludes the Committee is vested with discretion sufficient to avoid a <u>de novo</u> standard of

27

review.[4]

Regarding the second inquiry, O'Dell points out that
(1) four of the five Committee members are employed by Massey,
and (2) Massey pays Plan benefits from its general assets.
(Pl.'s Resp. at 4-5; see AR at 286). Despite these undisputed
facts, and the parties' stipulation concerning a modified abuse-

_____

[4]Even absent this explicit grant of discretion, the court
would conclude in the alternative that the Plan confers
discretion implicitly. Our court of appeals has recognized as
follows:

"We have not . . . always required an explicit grant of
discretionary authority. Rather, we have recognized
that a plan's terms can create discretion by
implication." Such discretion can be inferred from the
plain language of both the plan itself and the Summary
Plan Description. In United McGill Corp. v. Stinnett,
154 F.3d 168 (4th Cir. 1998), for example,
discretionary authority was found where a plan granted
the administrator authority to "construe the terms of
the Plan and resolve any disputes which may arise with
regard to the rights of any persons under the terms of
the plan." And in Boyd v. Trustees of the United Mine
Workers Health & Retirement Funds, 873 F.2d 57 (4th
Cir. 1989), we found implied discretionary authority
where the administrator was given the power of "full
and final determination as to all issues concerning
eligibility for benefits" and was "authorized to
promulgate rules and regulations to implement this
Plan."

Rego v. Westvaco Corp., 319 F.3d 140, 146-47 (4th Cir. 2003)
(citations omitted) (emphasis supplied). The court notes
O'Dell's concession that "The language contained in the SPD
Handbook would be sufficient to grant the Administrator
discretionary authority . . . ." (Pl.'s Mem. in Supp. at 8).

of-discretion standard, the court concludes the usual,
deferential standard applies.

Regarding the Committee members' employment, our court
of appeals has observed that "[i]n general, the fact that a plan
fiduciary is employed by or serves at the will of the plan
sponsor will not be deemed to create a conflict of interest
automatically raising a presumption of bias."  Johannssen, 292
F.3d at 177 n.14; Colucci v. Agfa Corp. Severance Pay Plan, 431
F.3d 170, 179-80 (4th Cir. 2005) ("First, Colucci points out that
Agfa has not hired independent employees to administer the Plan.
This fact alone does not support the presumption of a conflict of
interest, or even bias.")

Regarding Massey's payment of Plan benefits from its
general assets, our court of appeals confronted, and rejected, a
similar argument in Colucci, a case cited by neither party:

> But the simple and commonplace fact that a plan's
> administrator is also its funder is not enough to
> support a finding of a conflict of interest that would
> cause an adjustment to our deference.
>
>      . . . .
>
> There is a material difference . . . between a
> corporation whose business profits primarily derive
> from managing ERISA plans[, such as an insurance
> company,] and a corporation that collaterally manages a
> plan through which it chooses to provide its employees
> with benefits.  We question how a company that creates,

29

> funds, and administers a plan for its own employees'
> benefit can, from those facts alone, be presumed to
> have a financial conflict in administering that plan
> when the company remains free to end the plan
> altogether. The company's business plan could not be
> dependent on its denying benefits . . . because it
> could decide to deny all benefits simply by ending the
> plan should the benefits become too burdensome. When a
> company sponsors a plan and then administers it, the
> fact that the benefits cost money is insufficient to
> support the presumption of a conflict; that cost is the
> product of its election to provide the employees with
> benefits.

Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d at 179 (4th

Cir. 2005).  Our court of appeals recently reaffirmed Colucci.

See Donovan v. Eaton Corp., No. 05-2243, slip op at 7 (4th Cir.

Sept. 5, 2006).

     Were these two considerations not stripped of their

utility to O'Dell based upon circuit precedent, however, the

court notes a host of measures Massey has taken to assure the

Committee's functional independence, thereby diluting any

suggestion that a conflict of interest exists: (1) neither the

Committee nor its members are accountable to Massey for the

disability decisions the Committee reaches; (2) there is no

formal way Massey would learn when or where the Committee meets

or its discussions of participant eligibility; (3) Committee

decisions are not reported to senior management and decision

letters are treated as confidential and secured appropriately;

(4) the Committee members' compensation and tenure are unaffected by the decisions they reach; (5) the Committee does not learn the estimated or actual costs associated with awarded claims; (6) the liability associated with long-term disability claims is not material from a financial accounting perspective; (7) Mr. Poma explicitly admonished the Committee members about their neutral and detached role prior to taking up O'Dell's appeal; and (8) the Committee includes an independent medical professional who is not a Massey employee.

Inasmuch as O'Dell has failed to demonstrate a conflict of interest, the court concludes the customary abuse-of-discretion standard applies to this action.

C.   Whether the Committee Acted Within the Scope of its Discretion

The court notes initially that it is O'Dell's burden to demonstrate his entitlement to benefits under the Plan. Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir. 2005) (cited in Donnell v. Metropolitan Life Ins. Co., No. 04-2340, slip op. at *4 n.9, 2006 WL 297314 (4th Cir. Feb. 8, 2006)).

31

Although the court has considered each of the eight
Booth factors that appear relevant, the first, second, third, and
fifth factors, along with the eighth factor already dealt with,
are the subject of most controversy between the parties.  Each of
those factors is considered.

First, regarding the language of the Plan, one is
struck by its narrow definition of "Totally Disabled[.]"  The
Plan requires a condition that is "of long, continued, and
indefinite duration, which . . .renders an individual unable to
work at any substantial employment for which he is reasonably
suited by education or experience . . . ."

Second, regarding the purposes and goals of the Plan,
one finds at section 1.01(b) under "Purpose of Plan" the
statement that "Employees need and desire financial protection
for themselves and their Eligible Dependents for expenses they
incur because of illness, injury or death."  (AR at 114).  The
Plan thus evinces a desire to protect employees upon a proper
causation showing.  This protection is only necessary, however,
where a compensable illness or injury is demonstrated.  The
requirement of such a showing is doubtless intended to ensure the
financial integrity of the Plan, which will in turn allow it to
meet the laudable goal for which it was created.  See de Nobel v.

32

<u>Vitro Corp.</u>, 885 F.2d 1180, 1191 (4th Cir. 1989) ("Fiduciaries are obligated to act not only in the best interests of beneficiaries, but with due regard for the preservation of trust assets.  Adverse benefits determinations may well have saved considerable sums, but that may simply reflect that the trustees, bearing in mind the interests of all participants and beneficiaries, . . . made a considered decision to preserve the corpus of the trust, rather than grant a doubtful claim.") (citations omitted).

Third, the court considers in tandem the third and fifth factors that call for examination of (1) the adequacy of the materials reviewed and their supportive nature, and (2) whether the decisionmaking process was reasoned and principled. Regarding adequacy, the Plan obtained, either directly or indirectly, diagnostic and treatment information from ten physicians.  A great deal of information supplied by these medical professionals is summarized in each of the decisions rendered by the Committee in January and June 2004.  The Plan additionally reviewed the findings of two vocational rehabilitation counselors.

Beyond this largely uncontested observation, however, the parties differ sharply concerning (1) whether the medical

33

evidence supports the Committee's decision, and (2) whether the process by which the decision was reached resulted from a reasoned and principled method.  A discussion of O'Dell's concerns in this regard are necessary.

Initially, O'Dell relies heavily upon the total-disability conclusion reached by Dr. Snead.  Dr. Snead's findings, however, were contained in a brief, two and one-half page letter to O'Dell's lawyer.  Additionally, the letter mentions some of Dr. Mir's findings insofar as they assist O'Dell but avoids mention of those findings that counsel against a total-disability finding.  These contraindications include Dr. Mir's observations concerning (1) the lack of a whole-man impairment finding, (2) prior, normal muscle strength findings, (3) O'Dell's ability to manage his daily activities by himself,[5] and (4) the belief that he might only be disabled for another four months.

Next, O'Dell notes Ms. Harris' observation that he could not work productively in any capacity on a regular and consistent basis.  It should be noted, however, that Ms. Harris is not a medical professional.  Her one paragraph letter is also

_____

[5]The court notes that O'Dell later reported to Dr. Mukkamala that he "does not perform any of the household activities."  (AR at 39).

34

arguably personalized by reference to her co-worker's impressions of O'Dell's credibility, a co-worker who attended church with him.

O'Dell contends the findings of both Dr. Snead and Ms. Harris are supported by the remaining medical professionals in the case, with the exception of the Plan-retained Dr. Mukkamala. The record reveals otherwise at several points. For example, similar to what he conveyed to Dr. Snead and Ms. Harris, O'Dell told Dr. Crow his pain was a 9 on a scale of 10 on a constant basis. Dr. Crow, though, observed upon neurological examination that O'Dell was "in no acute distress" and was, indeed, "comfortable." (AR at 6). Also, contrary to the conclusions of Dr. Snead and Ms. Harris, Dr. Weinstein saw only a "little disc bulge at 4/5[,]" (AR at 9), and recommended O'Dell continue with exercise and physical therapy with the possibility that he might return to work with a brace.[6]

_____

[6]O'Dell contends the Committee's decision is contrary to our court of appeals' decision in Stup. In Stup, however, the entity that denied benefits was operating under a conflict of interest. Further, Stup involved not the disputed effects of a back injury but rather "overwhelming and uncontradicted evidence" of both lupus and fibromyalgia. Id. at 308.
    The Donovan decision is also worthy of further mention. That case resulted in a plan's reversal for denying benefits to an individual with degenerative disc disease and chronic back pain. The circumstances of Donovan though were markedly
(continued...)

O'Dell next points out the favorable decision he
received from the SSA, set forth in the ALJ's decision of October
20, 2003.  To the extent it is relevant in this setting, however,
the decision cuts both ways.  While benefits were awarded, the
ALJ observed that O'Dell had the residual functional capacity to
perform the exertional demands of sedentary work, a view shared
by Dr. Gobunsuy, who rated his capacity as sedentary and Dr.
Mukkamala who found him able to work at the sedentary/light level
with freedom to sit and stand as needed.  Although the ALJ
further concluded O'Dell was unable to sustain work in an
ordinary setting on a regular basis, reasonable minds may differ
concerning the weight to be accorded this finding in light of the
contrary views expressed by Drs. Gobunsuy and Mukkamala in 2003
as well as that of Dr. Ambroz who in 2000 and 2002 "calculated 0%
whole man impairment from all of [O'Dell's] three claims" and the
February 2003 assessment of Dr. Mir when he found O'Dell to be
temporarily disabled with an anticipated period of disability
that could be another four months.  Each of these opinions came
from examining physicians.

_____

    [6](...continued)
different from this case.  Among other distinguishing factors,
Ms. Donovan had undergone four back surgeries to repair herniated
discs.  She was also plagued by profound fatigue.

Finally, it would have been inappropriate to treat the SSA award as, _ipso facto_, warranting a favorable finding on the plaintiff's disability application here at issue.  The Committee instead drew a quite reasonable distinction between the award of SSA disability benefits and the denial of private disability benefits under the Plan:

> [E]mployers have large leeway to design disability and other welfare plans as they see fit. In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. "[T]he validity of a claim to benefits under an ERISA plan," on the other hand, "is likely to turn," in large part, "on the interpretation of terms in the plan at issue."

Smith v. Continental Cas. Co., 369 F.3d 412, 419 (4th Cir. 2004).

Despite O'Dell's protestations to the contrary, the Committee's decisionmaking process was both reasoned and principled.  For example, the June 11, 2004, decision sets forth the medical evidence supporting O'Dell's position and that evidence which tended to undermine a total-disability determination.  Indeed, the Committee stated explicitly that it "recognize[d] and discussed the differing medical opinions."  (AR at 87).  The Committee also explained at several points why it rejected certain evidence favoring a total-disability finding.

Based upon this consideration, and after considering each of the Booth factors, the court concludes the Committee's

decision is not subject to reversal.[7]  The foregoing discussion
reflects, among other things, a medical record that admits of
multiple possible conclusions regarding the true nature of
O'Dell's condition and his residual functional capacity.  Faced
with such a conflict, the Committee attempted to gather
additional medical evidence and then explained in great detail
why it reached a conclusion contrary to that urged by O'Dell.  In
so doing, it rendered a reasonable decision and one that was the
product of a deliberate, principled analytical process supported
by substantial evidence.

The court, accordingly, ORDERS that plaintiff's motion
for summary judgment be, and it hereby is, denied.  The court
further ORDERS that the defendants' motion for summary judgment
be, and it hereby is, granted.  It is additionally ORDERED that
this civil action be, and it hereby is, dismissed with prejudice
and stricken from the docket.

The Clerk is directed to forward copies of this written
opinion and order to all counsel of record.

DATED:   December 6, 2006

John T. Copenhaver, Jr.
United States District Judge

---

[7]With respect to the <u>Booth</u> fourth and sixth factors, there
is no suggestion that the fiduciary's interpretation is
inconsistent with other provisions in, or earlier interpretations
of, the Plan or the procedural or substantive requirements of
ERISA.